# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HANNAH MILLER, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>FORCEFIELD ENERGY INC., DAVID NATAN, JASON WILLIAMS, RICHARD ST-JULIEN, THE DREAMTEAM GROUP, and MISSION INVESTOR RELATIONS D/B/A MISSIONIR,<br><br>                  Defendants. | Case No.<br><br>**15 CV 3141**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br> |

## CLASS ACTION COMPLAINT

Plaintiff Hannah Miller ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ForceField Energy Inc., ("ForceField" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired ForceField securities between September 16, 2013 and April 15, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      ForceField is a designer, distributor and licensee of alternative energy products and solutions. The Company distributes light emitting diode ("LED") commercial lighting and fixtures. It also uses waste heat from manufacturing source to provide clean electricity.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) some of the reports issued by promoters paid by the Company pretended to be independent authors, did not disclose their compensation, and the content of the reports were reviewed by ForceField's management before publication; (2) members of its management have a troubling history with fraudulent companies; and (3) as a result of the foregoing, ForceField's public statements were materially false and misleading at all relevant times.

4.      On March 20, 2014, *Fortune.com* published the article, *At financial news sites, stock promoters make inroads.* The article discussed the role of stock promoters, specifically the DreamTeamGroup, and how stock promoter's must reveal compensation for these types of articles.

5.    As a result of this partial disclosure, shares of ForceField fell $0.53 per share or almost 9% over the next two days to close at $5.65 per share on March 21, 2014.

6.    On April 15, 2015, *SeekingAlpha.com* published an article entitled, *Forcefield Energy: Undisclosed Promotions And Management Connections to Past Fraud*, which further revealed the undisclosed promotion and control and knowledge over DreamTeamGroup activities. The *Seeking Alpha* article also disclosed the unscrupulous backgrounds of the Individual Defendants that they were required, but failed to, disclose in the Company's SEC filings.

7.    This adverse information caused the price of ForceField stock to tumble $2.97 per share, or approximately 39%, over the next two days to close at $4.74 per share on April 16, 2015.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired ForceField securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant ForceField is a Nevada corporation with principal executive offices located in this District at 245 Park Avenue, 39th Floor, New York, New York 10167. Through its subsidiaries, Forcefield designs, distributes, and licenses alternative energy products and technologies in the People's Republic of China ("PRC") and the United States. It distributes LED commercial lighting products and fixtures; and produces trichlorosilane, a chemical used for the production of polysilicon that is utilized as a raw material in the production of solar cells for photovoltaic panels. The Company also designs and installs proprietary modular organic rankine cycle units utilizing various refrigerant mixtures to enhance heat recovery and convert that waste heat directly into electrical energy. The Company's common stock is listed on NASDAQ under ticker symbol "FNRG."

14.     Defendant David Natan ("Natan") has served as the Chief Executive Officer ("CEO") and a director of Forcefield since December 8, 2010 and throughout the Class Period. He previously served as the Company's Chief Financial Officer ("CFO") from February 9, 2010 until his resignation on October 17, 2011.

15.     Defendant Jason Williams ("Williams") has served as the Company's CFO since October 17, 2011 and throughout the Class Period.

16.     Defendant Richard St-Julien ("St-Julien") has served as the Company's Executive Chair of the Board of Directors throughout the Class Period.

17.     Defendants Natan, Williams, and St-Julien are sometimes herein collectively referred to as "Individual Defendants."

18.     Defendants DreamTeamGroup ("DTG") is a securities advertiser and investor relations firm. It is an affiliate of Mission Investor Relations ("MissionIR").

19.     Defendant MissionIR is a securities advertiser and investor relations firm. It is an affiliate of DTG.

20.     Defendants ForceField, DTG, MissionIR, and Individual Defendants are herein referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Period

*Undisclosed Paid Stock Promotion*

21.     The Class Period begins on September 16, 2013 when the Company issued a press release entitled *ForceField Energy Announces Engagement of MissionIR Investor Relations Services.* The press release states in relevant part:

> ATLANTA, GA(Marketwired Sep 16, 2013) ForceField Energy Inc. (OTCQB: FNRG) (the "Company") today announces that they have engaged the investor relations services of MissionIR. Through a network of investor oriented sites and full suite of investor awareness services, MissionIR broadens the influence of publicly traded companies and enhances their ability to attract growth capital as well as improve shareholder value.

> "ForceField Energy has an exciting business model targeting two of the largest and fastest growing areas of the global renewable energy space," stated Sherri Franklin, Director of Marketing at MissionIR. "The Company is well positioned in both sectors and has an experienced management team in place to fully execute its growth strategy."

> David Natan, CEO of ForceField Energy, stated, "Engagement of a full service investor relations firm to develop and implement a strategic investor relations campaign is a key part of our overall strategy to achieve short term and long term goals. MissionIR is providing a much needed service in the small cap markets."

22.    Under the direction and control of ForceField and the Individual Defendants, DTG and MissionlR began to tout ForceField stock throughout the Class Period.

23.    The purpose of this promotional campaign was to raise additional capital, increase shareholder value, and raise visibility to the public capital market.

24.    DTG and MissionlR conducted a massive promotional campaign, which included publishing articles or news reports and making various statements through various social media outlets and websites, including *SeekingAlpha.com.*

25.    The articles did not disclose that they were authored by paid promoters under the control of ForceField nor did they disclose the authors had a business relationship with ForceField.

26.    Articles by DTG's paid authors Tom Meyer and John Mylant caused a steep runup in the Company's stock price as well as the articles created by MissioniR. Not only did they publish articles under their names, but they used pseudonyms. For example, Tom Meyer wrote under the name Wonderful Wizard.

27.    On October 28, 2013, Wonderful Wizard, also known as Tom Meyer of the DTG published the article entitled *3 Reasons To Buy ForceField Energy,* on *SeekingAlpha.com.* The article touted the Company and gave investors several reasons why it was a good choice to invest in the Company. This article failed to disclose that it was a paid promotion.

28.    On November 27, 2013, John Mylant of the DTG published the article entitled *ForceField Energy Is One Company Worth Watching In The LED industry* on *SeekingAlpha.com.* This article also touted ForceField as a good investment. This article failed to disclose that it was a paid promotion.

*Management's Lack of Disclosures Of Its Past.*

29.    On April 15, 2014, the Company filed its Form 10-K for the year ending December 31, 2013 with the SEC ("2013 Form 10-K"). With regards to the background information concerning the Individual Defendants, the 2013 Form 10-K incorporated by reference the solicitation of proxies for the Company's 2014 Annual Meeting of Shareholders ("2014 Proxy Statement"). The 2013 Form 10-K was signed by all Individual Defendants.

30.    On April 30, 2014, the Company filed the 2014 Proxy Statement with the SEC on Form DEF 14A. The 2014 Proxy Statement includes information about the executive officers of ForceField including Individual Defendants. The Proxy, signed by Defendant St-Julien, stated the following with regards to the Individual Defendants' prior occupations:

> The following includes the principal occupations for the past five years (and, in some instances, for prior years) of each of our executive officers:
>
> Mr. Natan is a seasoned financial executive. Formerly a Big Four CPA with Deloitte Touche, he has more than thirty years of experience in areas of accounting, treasury, finance, corporate operations, and executive level management of both public and private companies. Mr. Natan was appointed our Chief Financial Officer and Director in February 2010 and was appointed our Chief Executive Officer in December 2010. Mr. Natan maintained both positions until October 2011 when Jason Williams was appointed our Chief Financial Officer. From November 2007 through January 2010, Mr. Natan was President of Natan & Associates, LLC, a financial consulting firm. Mr. Natan's career has spanned a wide range of industries. He has previously served as CFO/Treasurer of four public companies and as CFO of three private companies. During his tenure as CFO, his public company was ranked as one of Forbes Magazine's "Top 50 Best Small Companies in America" for three consecutive years. He also served as a Director of a public company and as President of a public company subsidiary. Mr. Natan has participated in over fifteen merger and acquisition transactions. He has been instrumental in raising in excess of $500 million of debt and equity capital on favorable terms and from a variety of funding sources. Mr. Natan holds a B.A. in Economics from Boston University, where he was elected to the National Economics Honor Society. He also holds a Certified Public Accountant license (inactive) in the state of Florida.
>
> Mr. ST Julien has been a Director, Secretary and Chief Legal Officer of the Company since 2009 and Chairman of the Board of Directors since October 2011. Mr. ST Julien holds a Bachelor of Law from the University of Ottawa. Since

1992, he has been a practicing attorney in the areas of Commercial and International Law. Simultaneously, he has been involved in numerous business ventures as entrepreneur in Canada, in the United States as well as in other countries. Mr. ST Julien specializes in both International Business Law and Securities law in collaboration with strategic partners in Canada in the USA and in China. He possesses several years of experience in the public company environment, mostly in the USA, where he was involved in various listings, reorganizations, financings and acquisitions. Additionally, he acts as a consultant to corporations in their business ventures, including international financing. Finally, Mr. ST Julien has held positions in various public companies, such as secretary and member of the board of directors and officers.

Mr. Williams has served as Chief Financial Officer and Corporate Treasurer since October 2011. Mr. Williams has significant financial and operational experience with publicly traded companies. From August 2007 to August 2010, he served as Corporate Controller and Chief Financial Officer at Protective Products of America, Inc. and its successors. From July 2002 to August 2007, he served as Corporate Controller and Director of Reporting & Analysis at PharmaNet Development Group, Inc. From 1995 to 2002, he served in various financial leadership positions with Patagon.com, Inc., vFinance, Inc. and The BISYS Group. Mr. Williams has served as President of WM Consulting, LLC, a business advisory firm, since March 2001. He holds a Bachelor of Science from Florida Atlantic University.

31.    The statements referenced in ¶¶ 21-30 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) some of the reports issued by promoters paid by the Company pretended to be independent authors, did not disclose their compensation, and the content of the reports were reviewed by ForceField's management before publication (2) members of its management have a troubling history with fraudulent companies; and (3) as a result of the foregoing, ForceField's public statements were materially false and misleading at all relevant times.

### The Truth Begins To Emerge

32.    On March 20, 2014, *Fortune.com* published the article, *At financial news sites, stock promoters make inroads.* The article discussed the role of stock promoters, specifically the

DTG, and how stock promoter's must reveal compensation for these types of articles. The article states in relevant part:

> For example, Seeking Alpha has an article by Mylant, touting ForceField Energy (FNRG). *Mylant's disclosure in the article says he did not receive any compensation to write the piece. Yet ForceField is listed as a client on Dream Team's website. Seeking Alpha, which is in the process of reviewing and removing other articles, says it has evidence that Mylant was paid by some of his subjects to write articles about them.* Mylant could not be reached for comment. ForceField Energy did not return a call for comment.

> (Emphasis added).

33.    As a result of this partial disclosure, shares of ForceField fell $0.53 per share or almost 9% over the next two days to close at $5.65 per share on March 21, 2014.

34.    On April 15, 2015, *SeekingAlpha.com* published an article entitled, *Forcefield Energy: Undisclosed Promotions And Management Connections to Past Fraud*, which further revealed the undisclosed promotion and control and knowledge over DTG activities. The article states in relevant part:

> In the past, *ForceField was a Dream Team client. The Dream Team was a firm that got paid to write undisclosed paid articles, which were edited and approved by management teams of their clients. The retail targeted articles were designed to prop up the share price and volume so that companies could issue stock to raise money. The scam worked exceptionally well.*

> *       *       *

> Back in 2014, I wrote a detailed article about stock promotion firm "The Dream Team Group" which was hiring out writers to conduct undisclosed paid promotions on small cap companies. The writers would pretend to be well qualified industry experts putting forth a professional analysis (and a strong buy) on a stock. In fact, they were simply hired gun writers with no credentials whatsoever. Yet their professional writings invariably caused their target stocks to soar. The authors managed to infiltrate a wide variety of locations, including Forbes.com, TheStreet.com, Seeking Alpha and the Wall Street Cheat Sheet.

> To gain information, I posed as a paid stock promoter looking to write undisclosed paid articles. The chief writer for the Dream Team (Tom Meyer) then began giving me assignments.

The main stocks I wrote about in this promotion scandal were Galena Biopharma (NASDAQ:GALE) and CytRx (NASDAQ:CYTR), both of which ended up plunging by as much as 50-80% when the promotions unraveled. CytRx has rebounded some, while Galena has continued to plunge.

But there were other companies which I did not give as much attention to because they were too small or illiquid to matter at the time. (Although I did not write about many of these stocks, I did notify all of the various websites such as Seeking Alpha, TheStreet.com and Wall Street Cheat Sheet so that they could remove any articles and ban any violating authors).

*ForceField Energy is one such stock At the time, it was one of a number of beaten down illiquid stocks which didn't seem to be catching the promotional wave. But now it appears that the continued promotional efforts have resulted in the stock hitting all-time highs on much greater volume. This is all occurring just as the company needs to raise money.*

*ForceField was a paid Dream Team promotion which was written about by both Tom Meyer (multiple aliases including Wonderful Wizard and others) and John Mylant. These were the two main Dream Team writers.* Their articles have since been removed from Seeking Alpha, but the original references can still be found in various places. In addition, *ForceField is listed here among the other Dream Team clients on the Investors Hub page for Mission IR.* Mission IR was the Dream Team subsidiary responsible for handling the paid articles.

Mr. Meyer was also attempting to recruit me as a paid writer specifically for ForceField. ForceField was an ongoing project of his.

*It should be kept in mind that the standard process for these writers was to submit their drafts to management at the target company for review before publishing. In other words, management of these companies knew and encouraged the illegal stock promotion as a way of getting their share prices up.*

(Emphasis added).

35.     The *Seeking Alpha* article also to disclose the unscrupulous backgrounds of the Individual Defendants that they were required, but failed to, disclose in the Company's SEC filings. The article states in relevant part:

Aside from their history of using the Dream Team to promote their stock, *ForceField's three top managers all have extensive ties to past fraudulent companies which have gotten into substantial trouble, including investigations by the SEC, FBI, the US Senate and the Canadian Federal Government.*

ForceField is run by CEO David Natan. Notably, Mr. Natan does not name any of his past companies on his official bio. We can now see why.

From Bloomberg we can see the detailed history of Mr. Natan and his lengthy history of working with promotional companies based out of Boca Raton. For those who don't know, Boca Raton happens to be the center of stock promotion (and sometimes fraud) in America.

Further digging shows that his past companies are mostly bankrupt former pink sheets companies based out of South Florida, such as MBf, Global Technovations and IMX Pharma.

*Just prior to running ForceField/SunSi, Mr. Natan was CFO of a company called SFBC and he was the one responsible for signing off on their financial statements.*

*SFBC was basically a south Florida recruitment mill for finding subjects (often illegal immigrants) to act as guinea pigs in clinical trials for drugs that had not yet been approved by the FDA. A lengthy and scathing exposé on SFBC can be found on Bloomberg,* entitled "Big Pharma's Shameful Secret", and it is well worth reading. Anyone who has an interest in pharma or clinical trials should absolutely read that article. In the wake of this exposé, SFBC's share price fell by as much as 75%.

According to the fraud complaint filed in the District Court of New Jersey, SFBC told investors that it had a new state of the art facility which would drive the majority of revenues going forward. In fact, the building was nothing more than a dilapidated former Holiday Inn that was so structurally unsound that the Miami Dade County Unsafe Structures Board has since ordered the facility to be demolished.

It was fraud, plain and simple.

The fraud case goes on to state that:

SFBC risked its reputation and recruitment ability by utilizing a variety of unethical and dangerous practices that severely compromised the integrity of the drug trials conducted by the Company. For example, as detailed below, SFBC violated applicable minimum waiting requirements, used deceptive payment schemes to decrease the likelihood that a participant would report adverse reactions to the drugs being tested, failed to put into place adequate controls to prevent participants from applying to concurrent drug trials at other facilities, and failed to ensure that participants - the majority of whom are low-income individuals who speak English, if at all, as a second language - provided the required "informed consent."

Further, in order to ensure that SFBC's improper and unethical practices remained hidden from public view, the Company hired regulatory companies that were

completely beholden to SFBC and its employees. For example, throughout the Class Period, SFBC paid hundreds of thousands of dollars to a regulatory company called Southern Institutional Review Board ("Southern IRB") - a supposedly independent review board ("IRB") - to oversee and "approve" a substantial portion of their clinical tests. Southern IRB was owned and operated by the wife of a senior officer of SFBC. Similarly, SFBC utilized LeeCoast IRB to supervise its tests, despite the fact that LeeCoast IRB was owned by an SFBC subsidiary and employees of LeeCoast were paid directly by SFBC with checks prepared by SFBC's own accounting offices.

Clearly the goal of all of this was to prop up the stock so that money could be raised. And that plan worked quite well.

Defendants' untrue and misleading statements and omissions allowed SFBC to project the appearance of growth and success, which inflated the price of SFBC's securities and enabled the Company's insiders to enrich themselves at investors' expense. Indeed, during the Class Period, the individual defendants sold significant portions of their SFBC stock, generating tens of millions of dollars in personal profits. They were also able to orchestrate two large secondary offerings of SFBC securities, which allowed the Company to raise a total of approximately $250 million from unwitting investors.

Insider sales were large. As noted in the Sought Florida Business Journal, "SFBC execs pull in $15.71M from stock sales". This was just shortly before the fraud came unraveled and occurred before the stock price collapsed.

*CEO Natan isn't the only one with connections to fraudulent companies in his background. Like Mr. Natan, Chairman Richard St-Julien refrains from actually naming any of his past ventures or employers. He simply notes in his bio that:*

*Richard has a great deal of success and experience as a practicing attorney in the areas of Commercial and International Law. In addition, Richard has been involved in numerous business ventures as an entrepreneur in Canada, the U.S., China and other countries.*

*In reality, it is a bit more colorful than that. Mr. St. Julien appears to be an expert at moving money around in places such as (again, no coincidence) Costa Rica. Costa Rica is, of course, where ForceField ended up establishing its operations and where 100% of its assets were located until 2014.*

*In 2009, Mr. St. Julien was working as a lawyer in Costa Rica helping to funnel cash to and from convicted fraudster Jean LaFleur who was running a fraudulent scheme in Belize.*

The Canadian federal government was suing LaFleur for $7 million for his role in a government sponsorship scandal. According to the Globe and Mail:

Federal lawyers allege in the court documents that Mr. Lafleur "tried to liquidate his assets when it became obvious that [the government] would undertake legal action to recoup money that it had paid to [Mr. Lafleur] as part of his fraudulent scheme."... Mr. Lafleur said as part of his bankruptcy proceedings that he called on Mr. St-Julien to invest the money on his behalf in Liechtenstein, the Caribbean and Belize... Mr. St-Julien is a member of the Quebec bar, but he is working in Costa Rica, and has refused to explain what happened to $460,000 from the house sale that was invested in his Belize company, Parameter, which is now insolvent.

LaFleur was ultimately sent to prison for his role, but the money disappeared.

*As for ForceField's CFO, Jason Williams, he notes on his bio that he was previously at Protective Products of America (OTCPK:PPAFO), which happens to be a pink sheets company that trades for less than 1 penny. Not surprisingly, Protective was based in South Florida. In the 3 years that it traded as a public company, Protective never filed a single financial statement, so it is unclear what Mr. Williams' actual duties might have been at that company. (At ForceField, financial statements have been delinquent in each of the past 3 years, again raising doubts about his role as CFO).*

But it gets better.

Prior to that, Williams notes that at PharmaNet he was an integral part of the management team that facilitated a market capitalization rise from $150 million to $800 million during a three-year period. It does sound impressive.

*However, this bio fails to mention some key facts. Most importantly, PharmaNet is in fact the same SFBC that settled fraud charges two years after the Bloomberg article.*

Yes, in fact, the stock did spike to a valuation of over $800 million during the tenure of Mr. Williams. But that was before it cratered to as low as $50 million (down 85%) in the wake of the Bloomberg fraud exposé.

I would encourage readers to re-read the fraud case against SFBC and its management to fully appreciate its implications.

From the introduction of the fraud case:

This is a case about a company that repeatedly misled investors about the most fundamental aspects of its business and operations. That company is SFBC, and throughout the Class Period, SFBC and its senior officers told investors that SFBC was a well-run business with highly-qualified management and significant competitive advantages *in its* field. In reality, however, SFBC suffered from a raft of undisclosed problems that infected its business and threatened the Company's very survival.

After the US Senate launched an official investigation into the company, they simply began running their clinical trials in Canada.

You can read about the name change and the move to Canada in this article.

**"Troubled SFBC changes its name in hope of changing its fortunes"**

*The point of this is that all three top managers have substantial ties to companies with fraudulent activities in the past. They are now all working together in a fledgling company that is hitting all-time highs even as there are obvious signs of stock promotion. And of course, the company happens to be out of money.*

(Emphasis added).

36.     This adverse information caused the price of ForceField stock to tumble $2.97 per share, or approximately 39%, over the next two days to close at $4.74 per share on April 16, 2015.

37.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ForceField securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ForceField securities were actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ForceField or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ForceField;

- whether the Individual Defendants caused ForceField to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ForceField securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- ForceField securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold ForceField securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ForceField securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ForceField securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ForceField securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ForceField's finances and business prospects.

51.     By virtue of their positions at ForceField, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

52.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of ForceField securities from their personal portfolios.

53.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of ForceField, the Individual Defendants had knowledge of the details of ForceField's internal affairs.

54.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ForceField.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ForceField's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ForceField securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning ForceField's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ForceField securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

55.     During the Class Period, ForceField securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of ForceField securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ForceField securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of ForceField securities

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.


## COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

58.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     During the Class Period, the Individual Defendants participated in the operation and management of ForceField, and conducted and participated, directly and indirectly, in the conduct of ForceField's business affairs.  Because of their senior positions, they knew the adverse non-public information about ForceField's misstatement of income and expenses and false financial statements.

60.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ForceField's financial condition and results of operations, and to correct promptly any public statements issued by ForceField which had become materially false or misleading.

61.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ForceField disseminated in the marketplace during the Class Period concerning ForceField's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ForceField to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ForceField within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ForceField securities.

62.     Each of the Individual Defendants, therefore, acted as a controlling person of ForceField.   By reason of their senior management positions and/or being directors of ForceField, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ForceField to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of ForceField and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ForceField.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 21, 2015

Respectfully submitted,

**POMERANTZ, LLP**

Jeremy A. Lieberman
C/Dov Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _Hannah Miller_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against ForceField Energy Inc. ("ForceField" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire ForceField securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired ForceField securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in ForceField securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed _April 20, 2015_
           **(Date)**

_____
          **(Signature)**

_Hannah Miller_____
       **(Type or Print Name)**

**FORCEFIELD ENERGY (FNRG)**                                             **Miller, Hannah**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 12/30/2014 | PUR | 125 | $6.4299 |
| 03/10/2015 | PUR | 225 | $7.5000 |
| 04/07/2015 | PUR | 100 | $7.6300 |
| 04/16/2015 | SAL | 450 | $4.7100 |